All right, call up the last case for the morning, Eastern Concrete, Ms. Cortell. Thank you, Your Honor. May it please the Court, my name is Nina Cortell, and I'm here representing the appellant Eastern Concrete. This is an insurance coverage dispute arising out of the accidental discharge of some non-toxic, very small rock particles into an adjacent stream. Even though it is undisputed that the water quality of the stream was not affected by this discharge, the District Court nevertheless rejected insurance coverage based upon a pollution exclusion. We will argue two points. First, the District Court should have dismissed the case because it lacked jurisdiction. It lacked jurisdiction because the insured is a New Jersey corporation that did not purposefully avail itself of jurisdiction in the forum state, which is Texas. Second, the District Court erred in rejecting coverage because the pollution exclusion does not apply based on its plain language and this Court's precedence. I'll turn first to the jurisdiction. The background is that we have a New Jersey insured seeking coverage for a New Jersey incident from an Ohio company, that's the insurance company. The District Court nevertheless held that it had specific jurisdiction based on the In this de novo review of the jurisdiction ruling, we urge three reasons for reversal. First, the District Court holding on jurisdiction improperly merges the parent and sub in disregard of well-known principles of corporate separateness. Second, the fact of two overlapping officers is of no legal significance. And third, great Americans alternative agency arguments because they are giving you alternative arguments to what the District Court actually did. They disregard basic principles of agency law and so their agency, their alternative agency argument should also be not accepted. Obviously, the starting point of analysis is whether Eastern Concrete, the insured, not its parent, purposely directed its activities at Texas such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice and the answer is no. It is undisputed on this record that the insured's principal place of business and state of incorporation is New Jersey. There's a little bit of hedging on that by Great American in its briefing but its complaint says as much and that's their complaint. It's Record on Appeal, page 148. So it's undisputed that that is true. We also know by declarations that the insured conducts all of its contracting in New Jersey and it also is there operating 20 concrete plants, five quarries. That's where its assets, employees, and business is. Conversely, it's not registered to do business in Texas. It has no place of business in Texas, no bank accounts, property, et cetera. And the insurance policy itself, it is not a signatory to that policy. It is only before the court as an additional named insured. So much of the authority that they rely on doesn't apply because we don't have really someone who signed the contract. In terms of the record for what I've just told the court, it's very clear. I would refer you to the Beesaw Declaration at 563-64, the Pruitt Declaration at 1085. Let me ask you a question. Named insured clauses exist throughout the business world. Right. And quite often, they're completely unrelated parties who are named insureds, correct? Right. But whoever, it seems logical to me, particularly in the parent sub-deal, that whoever procured the insurance is the principle, so to speak, in the interpretation of the policy. So basically what they're, maybe this is somewhat incoherent, but basically what we've got here is an arrangement where the insurance company is going after the relationship that is responsible for the insurance. And Eastern, you know, I think there's a lot of merit to the principal-agent relationship here in part because of the overlap of the officers, the person who was the principal negotiator on, would have been a negotiator on a settlement. The agency that procured the insurance was in Dallas. It's really quite a, it's a fig leaf to say that in this particular circumstance, this named insured was not a participant. Well, there's problems with going down to the subsidiary level, both legally and factually in this record. There's nothing to tie the subsidiary to the procurement of the policy. Well, but there is. I mean, it seems to me there is because you do have overlapping officers, but it's hard to just put on blinders and say they were not acting in a dual capacity, both for the parent and the subsidiary, when they procured insurance coverage for 60 other, 59 other entities. I mean. Well, that's the. And this doesn't have, this is not the equivalent of piercing the corporate veil. We're not going to have to ask that. Well, that's absolutely right. There's no allegations of alter ego or any reason to compress the, as you would like under a single business enterprise or alter ego. That's right. No allegations, no evidence. But there's no evidence here either that anybody was acting on behalf of Eastern Concrete when this policy was procured. Well, there is because they admittedly were agents. They didn't act to benefit both entities as a legal matter. As a legal matter, the officers in question, first of all, I know this Court is well aware that we recognize that you can wear two hats and you don't necessarily because you're acting on behalf of one acting on the other. And there's nothing in this record to support what the district court did by engaging in a plausible posit that that's what happened. When you look at the only evidence that they have that truncates all of it, it's the Shekini Declaration at 747. He doesn't even look at the file until 2018, long after it's procured. And all he's basing his statement on is reviewing the policy itself that was procured by McGriff, that the parent is the primary insured, and that Eastern is an additional named insured. What is the parent in this situation besides just the corporate umbrella for the subsidiaries? I'm sorry, Your Honor? Does the parent company do any independent concrete business? No, it's a holding company, Your Honor. Well, exactly. But that doesn't mean under basic agency principles, which have not been refuted by any of the authorities cited to the Court in the briefing, that you have an agency relationship here and there's no basis to impute it. But we're not, are we, this is a weird question, but does the standard corporate agency analysis apply when what you're talking about is specific jurisdiction? I think it's a very interesting question, Your Honor, and I'd refer the Court to the Yamaha decision out of the Ninth Circuit. And they raised the question whether, after Daimler, an expansive agency theory can be used in a specific jurisdiction context. Yamaha went on to assume there is some agency principle that does survive Daimler, but they raised the question whether you can even use that. And what I think you'll find when you look at where the U.S. Supreme Court decisions have been going on specific jurisdiction over the last decade is more and more demanding to show specific conduct by the party you're seeking to hail into a foreign court. So I do not think that this would be a good case for an expansive agency analysis. And traditional agency principles require that you look at the conduct of the nonresident company to see, did it have the right to assign this authority? Did it have the right to control? And there's simply no evidence of that here. It certainly had the right to tell its officers whether it wanted insurance from, at all, or from. There's no basis to assume that agency relationship here. They might have had nothing to do with it. The case I would refer to the court, we provided by 28J, is the general accident versus old republic decision. It's from another jurisdiction, but the principles all apply here. Where you are a passive, simply a named, an additional named insurance, you know, a beneficiary of the policy. There's no reason to assume, either by agency or otherwise, that that named insured, that that's all they've done, that they have purposely availed themselves of the jurisdiction of the foreign state. Well, I would agree if you, in the general context, unrelated entities, you have a contract that says you will name me as an additional insured in your policies. I don't think that's enough. But here you have overlapping corporate officers who are clearly acting for the benefit of both corporations. I fully understand, Your Honor. Our principles are these, and I wonder if I can get to the coverage point as well. But our point is this. This is contrary to all the cases that hold you can't just willy-nilly merge the parent and the subsidiary. Texas law presumes corporate separateness. The fact that you have two shared officers is of no legal significance. That's best for John T. and P.H.C. and other authorities we've provided you. And we don't have any kind of agency relationship on, that adheres to the normal agency requirements. And I think that after Daimler, it's even a higher burden to show that. If I may move on to coverage. Alternatively, if the court maintains that there is jurisdiction here, we believe the case is reversed because the pollution exclusion does not apply by its own language. Under the exclusion for it to apply, the rock finds in question must be either an irritant or a contaminant. The insurance company does not even argue that they're an irritant, so that's out. And they're not a contaminant either. Put simply, the rock finds did not contaminate anything. If you look to clear drilling for the definition, it's condition of impurity resulting from the mixture or contact with a foreign substance. Also in that case, to contaminate is to render unfit for use. The Latin base means made impure. Just quite simply, nothing was rendered impure here. It's undisputed that the water. That's not the policy language. Pollutants means any solid liquid gases or thermal irritant or contaminant including but not limited to smoke, vapor, soot, fumes, acid, alkalis, chemicals, and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned, or reclaimed. Exactly, Your Honor. A couple of quick points. It has to be a contaminant. Even if it falls into otherwise waste material, it has got to be a contaminant. Who said? What says? I'm sorry? It did contaminate it. It was two feet deep in a trout stream. Your Honor, all that you'll see from the record is that we have property damage, pure and simple. It's not made inhabitable for the fish. No, there was no problem with the fish. What it is, is there were some little rocks got to the bottom of a stream and covered some of the feeding area. But the conclusion was that there was no harm to wildlife whatsoever, to the fish or whatever. I would refer the court to the following. Well it supposedly covered up the small animals or small whatever it was that the fish eat. And the New Jersey Department of Environmental Protection called it sediment and silt. Your Honor, whatever the phrases are used, what the record will show without any dispute whatsoever is what we're talking about are non-toxic rocks that did not render the water impure. You could drink the water. It had no effect on the drinking. It had no effect on wildlife. I would refer you to the VSAW declaration at 1989, the Rossi declaration at 2149, the McGriff letter at 1399. In particular, in the McGriff letter, I would refer you to, the bureaus have concluded that the pumping of rock fines into Spruce Run has not affected water quality and presents no threat to drinking water or to anyone who would use the area for fishing or to the fish they might catch. If that's so, why did you have to pay $2 million to clean it out? Your Honor, there was property damage, pure and simple. There was an, there was, it altered a little bit of the stream. It raised some of the levels so that there were problems. You're characterizing that as property damage, though. I don't know how else you look at it. And let me just say, Your Honor, if I may say this, contrast this with this Court's other holdings, where you have found this pollution exclusion to apply, it's radioactive nuclear waste, hydrogen sulfide gas, chemicals, things with chemical additives, and Your Honor, in the Isotex case, you contrasted that with the West Bend case, which involved clean sand. You said we don't have clean sand. You contrasted it with NREHUB, which is construction debris, and I would ask also that the Court look at Federal Insured v. Northfield. I apologize for it not being cited, but it's 837F3RD548 at 5532554. Judge Owen, you wrote that opinion, and in that one, there were similar kinds of allegations. Now, it's a duty to defend case, I recognize the difference there, but the Court did find that the policy, that the exclusion did not apply, and there was a duty to defend, where very similar effects were in play. Let me clarify one thing. Your argument hinges on the idea that the rock finds are not contaminants, so you are not relying on interpretation of the language here, waste material includes materials. Your Honor, we believe it's not waste material, but the first thing about waste material is it has to be a contaminant. I mean, if you read, as using this exclusion means any, and then it had these various things, irritant or contaminant including, I don't think there's any question either by the language of the exclusion or from the case law that you can't be stand-alone waste material. You have to be a contaminant, so that's our first answer. Our second is it's not waste material. It's nothing's being recycled, reclaimed, reconditioned. This is all rock that has been, what happens at this quarry is they... Well, it sounds like to me it's reclaimed from the mining process because it goes into water, it's sediment, and it's scooped out. It's all part of creating an original product, though. But it sounds like it's being reclaimed from smaller pieces, just like you would reclaim shavings off the floor. Your Honor, it's all part of the process of creating the rock finds. So we start with large granite pieces. They get crushed down into various sizes, used for different things, and the washing of it is just part of creating a product. Well, so is paper pulp. I mean, reclaiming the paper pulp. Well, then everything is reclaimed. This isn't... I would say re means again, used again and again. This is an original product created for an original use as fill material. And the final point I'll make about it not being contaminant, if this had been a contaminant, then the state of New Jersey would not have allowed us to return it to the site. And in fact, these rocks are all over the place in this area. So... My question is, you argue that implicitly in order to determine it as a contaminant, it has to have some element of toxicity into it? Or said differently... It at least needs to render... You're saying the absence of toxicity to any degree sort of negates the finding of it being a contaminant? Is that sort of your... Your Honor, I would submit to the court, and I think the case law, the courts are struggling with this, there have to be some limiting principles. Otherwise, the example given by the Seventh Circuit, quoted by this court, is that otherwise a draino gets spilled on the floor outside, and that's a contaminant. Because... Well, you seem to be arguing it's just kind of a neutral ingredient, therefore can't be a contaminant. I'm oversimplifying. But when you were... That is our position. ...emphasizing non-toxic toxicity, I was trying to appreciate whether you're kind of necessarily saying that in order to be a contaminant within the meaning of this exclusion, you know, there has to be some toxicity element. Basically, yes, Your Honor. I was going to say, if that's what you were saying, then I was just going to ask you what's the best authority for that proposition, that's all. Your Honor, first of all, I would say, as I said before, that there have to be some limiting principles. Otherwise, the chlorine in the pool, the draino on the floor, everything is pollution, and you've rendered this property coverage to be utterly illusory, because it will never apply. There have to be some limiting principles. And I would say that the cases that I've referred to, Your Honor, so, as I said, in Isotex, this Court contrasted what was at issue there, which was radioactive nuclear waste with clean sand, which is what was at issue in West Bend, or construction debris, which was at issue in Ray Hub. Those were sort of but-see kind of authorities by this Court as not being excluded. And also, excuse me, the federal insured case. We've got your main argument, and you've been helpful in responding to our question. Let's see what your counsel opposites have to say, and you've observed your rebuttal time. Thank you, Your Honor. Push back if you need to. All right, Mr. Ruggieri. This is a battle over definitions, huh? You're going to speak to the jurisdiction issue first? Yes. Your Honor, I was— Are you going to do the opposite? James Ruggieri, may it please the Court, James Ruggieri for the Applethe Great American Insurance Company. Your Honor, I was actually going to go in reverse order. Okay, go ahead. It's how my brain works. Go ahead. The Court asked questions about toxicity. I would point the Court to the Castle, Maine Farms case where the Court, applying Texas law, ruled that the discharge of saltwater onto a landowner's property, that property damage was barred by the pollution exclusion, noting that saltwater may be the most ubiquitous non-toxic substance out there. The point of that ruling was that if you take something that could be non-toxic and you put it in a place where it's not intended to receive it, then that is a discharge of that defines pollutants to include contaminants. What is not a contaminant if it accidentally—suppose they're carrying the rock finds in a truck destined for some construction location and the truck has an accident, the rock finds fall on the side of the road. Have they polluted the side of the road? It's interesting, Your Honor, because if the Court makes a— Yes or no? The answer is no, and I think what the Court would look to is the C.A. Turner case decided by the Fifth Circuit. And what the Court said there—and that's the case where the Fifth Circuit introduced the examples of Drano and chlorine. Drano and chlorine, indisputably, are toxic substances and contaminants. But what the Court said is we have to take a look and we have to figure out, we have to take a common-sense approach to the nature of the discharge. So if Drano were spilled in an office building and someone fell, that's not a discharge that one would commonsensically believe falls under the rubric of the pollutants. Actually, Drano is sodium hydroxide. If you've ever had to use it, you would realize that it is extraordinarily toxic. It is extraordinarily toxic, Your Honor, but that's why the Court didn't say that it wasn't a pollutant. It is a pollutant. It clearly is a pollutant. But the Court said, let's take a common-sense approach to the discharge issue. That's a real bad example, but— And chlorine is the other example, Your Honor. Chlorine, where someone has an allergic reaction in a swimming pool. They said, again, common-sense counsels against the application of the pollution exclusion there, but if you have a situation where Drano or chlorine, through industrial operations, is discharged into a stream, that's a classic situation where the application of the pollution exclusion would apply. And that's what we have here. The State of New Jersey made a claim against Eastern Concrete to clean up property damage caused by Eastern Concrete's industrial discharge of rock finds. I mean, but again, I go back to what they characterized that that was sediment or salt. Your Honor, I think what I would like to do also is counsel made reference to Mr. Rossi's declaration. And Mr. Rossi was the civil chemical and environmental engineer who worked on the cleanup of the property. And here is what Mr. Rossi said in his declaration. The State required removal of the rock finds because the material caused physical damage to the stream and bed by damaging the flow, including areas used for trout spawning. And then he went on to say, and also covering the micro and macro-invertebrates that served as a food supply for the fish in the stream. That's contamination, Your Honor. That's harmful. That's harm. That's contamination by an industrial discharge. Let me bring you back to the example that I gave, though. The rock finds fall out of the back of the truck on the side of the road. They're probably going to kill, God forbid, bluebonnets. Then, Your Honor, I think the question would be under the C.A. Turner test, does common sense counsel for or against the application of the pollution exclusion to that discharge? So whether something is a contaminant depends not on the inherent nature of the substance but on the context as well. I don't know whether it qualifies as a contaminant. I think it's whether it's a discharge or the presence of a contaminant barred by the pollution exclusion, Your Honor. And I would cite the case to the one most similar on point is a case in California, the Ortega rock quarry case, where the court ruled that the rocks that were discharged through a quarrying process, the way that it was discharged here into a stream, also was barred by the pollution exclusion. Your Honor, I would be remiss if I didn't point out to the court that Eastern Concrete's own lawyer in January of 2018 told my client, Great American, in discussing this claim that, quote, the state has taken the position that Eastern Concrete's accidental pumping of rock finds and settlement into spruce run violated provisions of three New Jersey statutes, including New Jersey's Pollution Water Pollution Control Act. And then Mr. Keel went on to say, and this is at the record at pages 586 and 587, he went on to say that the allegations, among other damage, was three, pumping of a deleterious substance, resulting in a negative impact to a trout-producing stream. Well, but deleterious is not the language in your policy. It's not, but there's no way that deleterious means that it's harmless, which was the point of counsel to say that it didn't harm the fish. What Eastern Concrete and what the state of New Jersey was saying is just the opposite, that it did affect the ecosystem. It did harm the ecosystem. It affected the spawning of trout. It affected the food supply. The rock finds that fall on the side of the road onto the landscaping or shrubbery or whatever are going to be harmful to that landscape. I think, Your Honor, if I'm in line with a C.A. Turner, I'd have to look at the nature of the discharge to tell me what counts, common sense. When you're saying it's not just when you're saying nature of the discharge, you're saying that whether something is a contaminant depends upon the nature of the substance and the surrounding circumstances. I would say if it's a loss within the pollution exclusion, it does involve those two things. In the C.A. Turner case, for example, this court held that common sense counseled in favor of applying the pollution exclusion to a release of gas inside a plastic tent. I mean, that's what I found difficult about this case because common sense does not suggest that putting sediment or silt in a stream is necessarily going to be polluting the stream. But, Your Honor, I think common sense does when you're talking about the industrial discharge of a waste material into a stream. It's not a waste material. It's little tiny rocks that have settled to the bottom and had all the dirt taken off of them. It's little tiny rocks that are discharged into a stream that affects the wildlife there. I think it is harmful. It does harm the environment. I think it's an industrial pollution event. It's not my driving a truck and rocks fall out of my truck when I'm doing my stay-at-home project. This is an industrial operation, rock quarrying, that has to get permit approval to do what it did, and it violated these environmental... This was the New Jersey Department of Environmental Protection that issued the citations. But, you know, environmental agencies can do a lot of things prophylactically that aren't... and, in fact, they do precisely to prevent anything worse. If this had clogged up the stream and blocked the stream, it might be another situation, I propose. But I'm just... And, Your Honor, it wasn't prophylactically, as the record shows. These were violations that were cited by the New Jersey Department of Environmental Protection. Again, the citations and all that may be based on a law that is in part prophylactically broad. Your Honor, we would also point the Court to the Clarendon v. Bay case. That's a case that has a toxic substances exclusion that specifically identified silica and barred coverage for the bodily injury arising out of exposure to silica. The Court went on to consider whether pollution exclusion barred coverage for exposure arising out of sand and gravel, and the Court held that it did there. Again, the nature of the discharge, it was harmful to the people who breathed in the sand and gravel, and the Court ruled that the pollution exclusion barred coverage for those injuries as well. And again, the Ortega-Rock Quarry case from California is the case that's closest on point cited by either of us, and we would cite the Court to the Rossi Declaration as well as to the Keele letter, which I discussed, which I provided the record site earlier. Your Honor, I did want to talk a little bit about the jurisdictional issue. I think it was maybe overlooked a little bit in that it's important to know the posture in which this issue was raised. It was raised in connection with a motion to dismiss for lack of personal jurisdiction. Eastern Concrete did not renew that argument in connection with the summary judgment motion. As a result, the standard here is different than it would be if the issue were addressed on summary judgment. The standard here is whether plaintiff, my client, made a prima facie showing of personal jurisdiction, and the law is clear that to make that prima facie showing, my client had to allege facts, which, if true, would support the exercise of jurisdiction. The district court was required to take my client's allegations as true unless they were controverted by defendant's evidence. I think it's important to both look at what we offered and what defendants offered in response. Our allegations of Eastern Concrete's purposeful Texas activities are set forth in paragraphs 17 through 22 of our complaint. That's at the record at pages 17 through 19. We made our allegations regarding general jurisdiction in paragraphs 17 and 18 of that complaint. We made our allegations of specific jurisdiction in paragraphs 19 and 20. In those paragraphs, we allege that Eastern Concrete engaged or authorized its parent to engage on its behalf a Texas insurance broker, McGriff, to advise on and obtain insurance coverage to cover Eastern Concrete's liabilities. We allege that broker McGriff did just that and obtained coverage from my client to cover Eastern Concrete's liabilities. Excuse me, sir. When judgment has been granted, you needed to approve this, right? You can't just rely on your allegations, right? Well, actually, the law is clear, and I would cite the court to the Mullins case and the Peterson case that says just the opposite. But judgment has been entered already. Judgment has been entered, and we actually allege more specific context with Texas, including that the broker did what was asked of it and obtained policies in Texas, issued under Texas forms to the Texas first-named insurer, U.S. Concrete. We allege that Eastern Concrete— Are you acknowledging that you could not survive if this was a question of clear error in the court's findings? Your Honor, I don't think it is a question of clear error because we made the allegations to support specific jurisdiction. Our cause of action arises out of the Texas context, both in obtaining the policy and in making the claim for coverage under the policy, which, again, was made through a Texas broker to Great American. Well, Your Honor, I think it's important that if you're the party opposing or moving to dismiss, you have to rebut the allegations. There are no allegations offered or no evidence to rebut our allegations. And I would also point out, Your Honor, that we offered more than just the allegations. We offered documents showing that Eastern Concrete told the State of New Jersey that, hey, we have two officers and a director, and here are their addresses, Texas. Mr. Pruitt, Mr. Jones, maybe— Well, I'm just quibbling with you, but I think what we've got is how to characterize facts in the record that are undisputed on each side. And, Your Honor, I think undisputed facts have to be characterized in favor of the allegations that were made and accepted as true, consistent with the Peterson case and the Mullins case versus Testamerica from the Fifth Circuit. But they had their own contrary allegations. No, and actually they actually were held to the judgment on a motion to dismiss, even though judgment was entered there, too, Your Honor. That was the point of we have raised the issue, preserved the issue for appeal. We offered the Great American Policy itself. It has Texas all over it, 46 separate endorsements that say Texas, Texas, Texas. The policy was issued. What about that? But they're saying there are no minimum contacts of Eastern Concrete with Texas or insufficient minimum contacts. Well, Your Honor, I think on that point there clearly are sufficient contacts by virtue of a couple of things. One, we believe and allege that Mr. Jolis and Mr. Pruitt were involved in securing, obtaining the coverage and making the claim for coverage from Texas. There's no declaration that says otherwise. The only declaration that was put in was a reply declaration provided by Mr. Pruitt. On reply, I don't want to ‑‑ I'm not sure whether it's appropriate to consider, but assuming it is, he disputed the general jurisdiction allegations of 17 and 18 that Eastern Concrete regularly conducted business in Texas. He did not dispute the specific jurisdiction allegations we made in paragraphs 19 and 20. If there was a dispute as to those allegations about what they did in connection with obtaining the coverage and making the claim for coverage, then they were bound to say that. I think that the lead case that they point to when they say this is like that is the Pandy Brandywine case versus Pepco, a power company in the Washington, D.C., area that I'm quite familiar with. This case is nothing like that case there. The court ruled that the allegations there were conclusory because all the plaintiffs said is Pepco knew they were dealing with Texas plaintiffs, and if they pulled out of a purchase agreement, they should have known there could be a domino effect on us under other agreements to which Pepco is not a party. That's pretty attenuated. It's pretty conclusory, and, Your Honor, we did the opposite of that. We made specific allegations and specific allegations. You would think this would come up all the time, given that insurance policies are procured in different states for people across the country. Have you looked specifically for insurance cases? Your Honor, specifically for insurance cases, I've looked specifically at the agency cases. I think the agency cases that we cited to the Court were the Tractable Energy case from the Texas Court of Appeals that said absolutely the parent can act as an agent for a subsidiary. I'm talking about insurance cases. I mean, surely this comes up. The Walker insurance case is an insurance case, Your Honor, from the Texas Court of Appeals. Again, that's a situation where the principal can ratify the acts of the agent, and the contacts of the agent, if there's ratification, can be inferred and imputed to the principal. And that's a situation we have here. I do. Counsel put in a 28F submission, and she cited one of the cases for that, the general accident v. Old Republic. I dare say that case is from a Federal District Court case from 1986, and I think if the Court looks at that, the Court was not correct on how corporations work. A parent puts in place officers and directors for a subsidiary, and those officers and directors ---- You keep talking about agency. I mean, it just seems to me in an insurance context, have you found and did you look specifically for this path? Your Honor, I've never ---- I'm unaware of a situation where a policy is issued to a lead named insured in Texas as the case of the situation here, and the named insured or additional named insured disputes that it's bound by those Texas contacts. The Ready Ice case, though, is that situation in that the policy at issue there was issued to a different named insured than the subsidiary seeking coverage under it. And, of course, there was no mention of the arguments here. I think that case and the general principles of agency do support the jurisdictional finding here. A principle certainly has the right to decline the benefits offered on its behalf. And that, Your Honor, goes to the importance of the allegations that we made in our complaint, Judge Owen, in 1920. That's why we allege that. We allege that Eastern Concrete or U.S. Concrete on its behalf engaged in these purposeful Texas activities. And this cause of action that we're raising arises out of those purposeful cause of actions or purposeful activities in the state of Texas. We think that this is a clear case where both the contacts and the cause of action, there's a clear connection to that, which distinguishes this case from, among others, the Bristol-Myers case. Well, under your ratification theory, any time that, you know, international parties, for example, say you must include me as an additional insured and there's no corporate connection at all and the additional name insured relies on, you know, this other party to get insurance for it, if they accept the insurance, then they've had potential contact. Your Honor, I think that it would be incumbent on that party to say it's not fair, which is the third prong of the test under CIFR. The reason why it's fair here is because of the overlap in the officers and directors between the two companies. That's why it's not unfair to hold this subsidiary to the contacts through the parent case. The other point I would make, the Best Foods case, Your Honor, says that if you have a dual officer and director, the presumption is actually that the officer and director is acting on behalf of the subsidiary. Your Honor, it didn't come up, but there was a 26-F affidavit in submission citing two cases. The other case was the Cincinnati insurance case. I'm not quite sure why that was cited. We're not talking about accident. To the extent it was cited for reasonable expectations, I would close by just stating Eastern Concrete's reasonable expectations that it told the world in its securities filings, including the Form 10-K for 2016, quote, we generally do not maintain insurance to cover environmental liabilities. That's at the record at 1448 stated in the Eastern Concrete 10-K. Thank you, Your Honors. All right. Thank you. Back to you, Ms. Cartel. Thank you, Your Honor. Let me just be very clear that if we're going to decide this based on the reasonable expectations of the insurer, the reasonable expectations of this New Jersey company was that this should have been in New Jersey court under New Jersey law and there should be absolute coverage, and it should not have been hailed into court into Texas. So that was the reasonable expectation here. But let me address some of the points that he's made. On the pollution issue itself, I think this Court is right. We need to have a common-sense approach. Whether you look at the item itself, which was just innocent, innocuous rock, non-toxic, rendered nothing impure, it should not fall within a pollution exclusion. And if you look then also even at the circumstance, what happened, it was pure property damage. That's what a property damage policy should apply to. And in terms of the Rossi Declaration, I think both opposing counsel and myself are going to refer you to the same things, and we stand by it. What Mr. Rossi says is the project was not considered an SRP site, no violation of the New Jersey Spill Act, which governs discharges of contaminants, or any similar statute or regulation was ever alleged by the State. That is not what was at issue. What was at issue was simply that some rocks went into a waterway and had to be removed. That's all we're talking about. And, yes, it was expensive to remove it, but we undertook that and we expected coverage for that. Because this is an exclusion in the policy as opposed to a coverage issue. Right. It used to be, may not be now, a governing principle in terms of construing exclusions. So either under Texas law or New Jersey, is there a governing principle on construing the exclusion either for or against? Exactly right. To be strictly construed, the burden is on the insurance company to show that it applies, so benefit of the doubt would go toward the insured. And we believe absolutely they've not made their case under it. For them to refer to collateral things like a 10-K or even statutes that are not in play here, it is completely collateral to the court's analysis. This court, of course, looks to the language of the exclusion. Does this fall within it or without it? That's where this court should look. If they wanted to draft an exclusion that said, then that would be a different story, but that's not what we have here. So for them to rely on collateral things as they do, and they've done throughout this case, to me shows the weakness of their position. You don't need to look beyond the policy itself to say that it should not apply here. Under the authorities that we've given you and under the principles this court has stated. This also goes to a complete, and I'm going to call it out because, frankly, the district court did this as well. This notion that our trial court lawyer dinged us because he called it deleterious is completely false. It is a red herring. What he's doing is he's referring to some language from a statute that had been invoked in New Jersey. So look at that. The judge in the district court opinion said it right at one point and then said it wrong at another point. This is not our lawyer speaking out against us. But as I said, whatever was or wasn't, whatever language is used to describe it, whatever adjectives people pull out, what is undisputed, absolutely undisputed, is these are non-toxic rocks that did not injure any wildlife and did not render any water impure. The very day this happened, you could go swimming in the Spruce Run Creek. You could drink the water. It's a water source for downstream water. It never impacted any of that. And in that situation, the pollution exclusion should not apply. Let me ask a general question. Why does the company proclaim that it doesn't generally buy, you know, pollution coverage? Well, I invite the court to look at the 10-K, and what they're really talking about is more of a CERCLA kind of analysis. Let's say you buy some property and there's some historic environmental liabilities. I do not think, if you look at the 10-K, they're talking about when clean rocks go into an adjacent stream. Well, I don't care in general. I'm just saying that, you know, I'm sure there's other things that happen at a concrete producing plant that could be toxic, and I just wondered about pollution exclusions. I have read the 10-K because they have referred to it before. I don't think it, to your point, I think it goes to other kinds of things that might happen or situations the company might find itself in where you actually have chemicals involved, not where you have clean rock going into a stream. I just don't think this has anything to do with that. All right. You're out of time on the panel. I'll give you one last salvo. Okay. One last salvo. Thank you. Thank you. One last salvo on the jurisdictional issues. Okay. On jurisdiction, I would like to address the standard of review. I agreed about prima facie, but it won't help them here for a couple reasons. One, the allegations they're referring to in the complaint are conclusory. Under the prima facie standard, that doesn't get you anywhere. When you look at the evidence then presented, then it's all, as we have said, showing no purposeful availment by the New Jersey insured. And if you want to see what they're basing their allegations on, and by the way, they make no allegations about joint officers. That was a plausible posit that the district court made in his opinion. That's not in here. What's in here are more conclusory allegations that get no weight under the prima facie standard. But look at the Shikany Declaration, because that at page 747, because all this is is statements based upon looking at a policy that named us as a named insured and saying because of that and because McGriff is involved, you must have authorized this or you must have purposefully availed yourself of the jurisdiction when there's absolutely no evidence to support that. If you sued your insurance company in New Jersey, would you have jurisdiction over the Texas insurance company in New Jersey? I think so, because they would have provided insurance to New Jersey insured. Okay. And you didn't, did you offer evidence of any sort in regard to jurisdiction? We did, Your Honor. That's what I thought. That's why I was confused about this thing. That's right. I think you have to look at the declarations, and specifically we refer you to the BESA Declaration 563-64, the Pruitt Declaration of 1085, and what Pruitt says is we conduct all of our contracting in New Jersey. I think that ends it. All right. Thank you. Thank you, Your Honor. Thank you, counsel. The case will be submitted. The panel will stand at recess until 9 a.m. in the morning.